**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MICHELLE PRECIA JONES,<br>Plaintiff,<br>v.<br>SEPTA and ALFRED OUTLAW,<br>Defendants. | 2:12-cv-6582-WY |

# MEMORANDUM

YOHN, J. August 6, 2014

Michelle Precia Jones brings this action against her former employer, the Southeastern Pennsylvania Transportation Authority ("SEPTA"), and her former supervisor, Alfred Outlaw. Alleging a hostile work environment, discriminatory termination, and retaliatory termination, Jones brings claims under Title VII of the Civil Rights Act of 1964, the Pennsylvania Human Relations Act ("PHRA"), the Family and Medical Leave Act ("FMLA"), and 42 U.S.C. § 1983 for violation of the Equal Protection Clause.

SEPTA and Outlaw have filed a motion for summary judgment on all counts. For the following reasons, the motion for summary judgment will be granted.

## I. Background

Jones was an administrative assistant in SEPTA's Revenue Operations Department from 2001 to 2011, and Outlaw was Jones's direct supervisor throughout her tenure. Jones was an hourly employee, and her time reports were generated by the department's timekeeper—

Gabrielle Greene—based on timesheets that Jones submitted to Greene that were approved and individually signed by Outlaw.

On December 1, 2010, Outlaw informed Jones that she was suspended with pay pending an investigation into possible fraud related to her timesheets and/or false reporting of her time. Outlaw told Jones that, in the course of preparing her annual performance review, he discovered discrepancies between the official records of her hours and his personal recollections and records of her workplace absences. Jones denied that she had incorrectly reported her time and told Outlaw that his recollections must be mistaken and his records incorrect.

The next day, Jones contacted SEPTA's Equal Employment Opportunity ("EEO") Office to file a sexual harassment complaint against Outlaw. In a meeting with an EEO Office representative on December 7, 2010, Jones alleged that Outlaw often looked down her blouse and made "hmm hmm"-type noises in her presence, that he once commented on her chest size after seeing a picture of her from a vacation, and that he once asked her to step on his back, ostensibly to relieve back spasms. Jones further alleged that Outlaw referred to her as his "work wife" and that he required her to do work for the benefit of non-profit organizations with no relationship to SEPTA. A member of SEPTA's Office of Inspector General (OIG) was present at this meeting, and he inquired about the hours-worked discrepancies flagged by Outlaw the week before. Jones denied that she had submitted falsified timesheets, and she further alleged that her suspension by Outlaw was in retaliation for informally opposing his alleged harassment. Prior to the December 2 contact and the December 7 meeting, Jones had not reported any issues about Outlaw to SEPTA's EEO Office.

Jones remained suspended with pay through February 22, 2011, when she received a letter from John McGee entitled "Notice of Charges/Reasons for Imminent Discharge." McGee

was Outlaw's supervisor, and he had overseen the OIG's investigation of Jones's time records and a separate, parallel investigation by the EEO Office into Jones's complaint against Outlaw. The letter informed Jones that the OIG had completed its investigation into Jones's time reports, and that the investigation's findings showed that Jones "had engaged in an elaborate scheme whereby [she] duplicated at least five different original signatures of Mr. Outlaw from previously signed timesheets, and then somehow superimposed them onto blank timesheets and inserted false information thereon for purposes of electronic submission." Specifically, McGee pointed to the following evidence produced by the investigation: (1) whereas Jones was required to submit her timesheets to Greene in hard copy form, Greene told investigators that she typically only received Jones's timesheets via email; (2) according to a forensic handwriting expert who analyzed Outlaw's signatures on Jones's timesheets, at least 27 of the signatures fell into five different groupings wherein Outlaw's signatures were identical; (3) in addition to the 27 timesheets found to feature a duplicative signature, an additional ten timesheets could not be reconciled with Outlaw's personal records of her absences; and (4) to corroborate Outlaw's personal records of Jones's absences, the OIG reviewed SEPTA IT records of Jones's building access swipes, computer log-ins, and emails, and these records "wholly validate[d] the accuracy of Mr. Outlaw's diary entries with respect to proving that [Jones] was not working on those days in dispute." Citing multiple violations of SEPTA personnel policies, a loss to SEPTA calculated to be $6,874.20, and Jones's denials of malfeasance in light of her inability to produce rebuttal evidence, McGee stated there was cause to terminate Jones and informed Jones that she was immediately suspended without pay pending imminent discharge. Attached to the letter were the 27 timesheets featuring duplicative Outlaw signatures.

Jones elected to appeal McGee's findings via a paper hearing, and, on March 29, 2011, Jones wrote a rebuttal letter to SEPTA's general manager of human resources in which she denied the substantive charges against her and alleged that her December 1, 2010 suspension and the February 22, 2011 Notice of Charges/Reasons for Imminent Discharge were acts of retaliation perpetrated by Outlaw related to either Jones's informal opposition to Outlaw's alleged sexual harassment; Jones's formal EEO complaint against Outlaw; and/or Jones's FMLA leave, which she took between August 2010 and November 2010.

On April 6, 2011, SEPTA's determination hearing officer, Mark Honebrink, issued SEPTA's formal determination of the charges against Jones, entitled "Written Notice of Determination Pursuant to Policy #E21." Honebrink upheld the finding of just cause for substantially the same reasons as given by McGee, stating "it is clear from the evidence that the timesheets you electronically transmitted to Ms. Greene bore copies of Mr. Outlaw's legitimate signatures that were improperly reproduced onto those timesheets by some means," and that Jones's denials of any wrongdoing with respect to the submission of altered timesheets was "highly incredible under the circumstances." Explaining his reasoning, Honebrink stated that he "f[ou]nd the report of the handwriting expert retained by the OIG to be most compelling," and also "f[ou]nd that the information developed by the OIG investigators on their own and from the SEPTA IT Department to be equally persuasive." By his letter, Honebrink discharged Jones from her employment effective immediately.

After her termination, Jones filed an action with the EEOC, and, on September 7, 2012, she received notice from the Department of Justice informing her of her right to sue. On November 23, 2012, Jones filed the instant action, and, on April 1, 2013, she filed an amended complaint. In her amended complaint, Jones brought a Title VII gender discrimination claim

against SEPTA (Count I); a Title VII retaliation claim against SEPTA (Count II); PHRA gender discrimination claims against SEPTA and Outlaw (Count III); PHRA retaliation claims against SEPTA and Outlaw (Count IV); § 1983 claims based on the Equal Protection Clause against SEPTA and Outlaw (Count V); a common law wrongful termination claim against SEPTA (Count VI); and an FMLA claim against SEPTA (Count VII).

On April 15, 2013, SEPTA and Outlaw filed a motion under Rule 12(b)(6) to dismiss all claims against Outlaw and Counts II, III, IV, and VI of the amended complaint against SEPTA. On May 9, 2013, I granted the defendants' motion as to Count VI of the amended complaint only. *See Jones v. Se. Pennsylvania Transp. Auth.*, 2013 WL 1934552 (E.D. Pa. May 9, 2013).

On November 27, 2013, SEPTA and Outlaw filed the instant motion. They seek summary judgment on all remaining claims against them.

## II. Legal Standards

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation omitted). "In evaluating the motion, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Guidotti v. Legal Helpers Debt Resolution, LLC,* 716 F.3d 764, 772 (3d Cir. 2013) (internal quotation omitted).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted); *El v. Se. Pennsylvania Transp. Auth. (SEPTA)*, 479 F.3d 232, 237 (3d Cir. 2007). The burden then shifts to the nonmoving party "to make a showing sufficient to establish the existence of . . . element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "If a nonmoving party fails to make [that showing], there is no issue as to a genuine issue of a material fact and thus the moving party is entitled to judgment as a matter of law." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 266 (3d Cir. 2007).

## III. Discussion

### A. Federal Claims

#### 1. Title VII Gender Discrimination Against SEPTA (Count I)

Count I of Jones's amended complaint brings a Title VII discrimination claim against SEPTA. Title VII's anti-discrimination provision provides that an employer may not "discharge . . . or . . . discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment because of such individual's . . . sex[.]" 42 U.S.C. § 2000e-2(a)(1). "A plaintiff may further establish that an employer violated Title VII by proving that sexual harassment created a hostile work environment." *Huston v. Procter & Gamble Paper Products Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). Jones's Title VII discrimination claim is independently founded on her contentions that she was suspended and/or terminated because of her sex, and that Outlaw's alleged sexual harassment made her work environment hostile.

##### a. Discriminatory Suspension and/or Termination

Jones's Title VII discrimination claim is first founded on her contention that she was suspended and/or terminated because of her sex. To make a prima facie case of gender

discrimination as to her suspension or termination, Jones must show that (1) she is a member of a protected class; (2) she was qualified for her position; (3) the particular disciplinary measure was an adverse employment action; and (4) the circumstances of the disciplinary measure give rise to an inference of discrimination. *See Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797-98 (3d Cir. 2003); *Oliver v. Clinical Practices of University of Pennsylvania*, 921 F. Supp. 2d 434, 447 (E.D. Pa. 2013).

**i. Suspension**

According to the defendants, nothing in the record raises an inference that Outlaw was motivated by discrimination when he suspended Jones pending investigation into her time reports. Even if so, however, the defendants contend this suspension was not an adverse employment action, and therefore is not actionable under Title VII.

"Although our Court of Appeals has not addressed this issue, those courts of appeals that have done so have found that placing an employee on paid administrative leave where there is no presumption of termination is not an adverse [employment] action." *Killen v. Northwestern Human Services, Inc.*, 2007 WL 2684541, at *4 (E.D. Pa. Sept. 7, 2007) (citing *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006) (agreeing with the Fourth, Fifth, Sixth and Eighth Circuits that "administrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action")). Following the persuasive authority of those courts, this court has also held that a suspension with pay is not an adverse employment action. *See Killen*, 2007 WL 2684541. Jones does not point to any legal authority to the contrary, nor does she offer any reason to adopt a different position than the courts of appeals that have considered the issue. I find that Outlaw's suspension of Jones pending investigation into her time reports

was not an adverse action for purposes of Title VII, *see Joseph*, 465 F.3d at 91, and, accordingly, that it cannot be the basis of a Title VII discrimination claim. *See Sarullo*, 352 F.3d at 797-98.

**ii. Termination**

The defendants argue that nothing in the record raises an inference that Jones's termination was caused by discrimination. In response, Jones contends that one can infer a discriminatory motive in the adverse actions against her[1] because (1) Outlaw demonstrated a "sexist state of mind" through his alleged sexual harassment and alleged preferential treatment of male employees, and (2) SEPTA did not terminate the employment of Outlaw or John Solecki—a subordinate of Outlaw and colleague of Jones in the Revenue Operations Department—after Solecki, with Outlaw's permission, underreported his vacation time to compensate for unpaid overtime work.

Assuming arguendo that Outlaw indeed sexually harassed Jones and gave preferential treatment to his male employees—the defendants vigorously dispute these allegations, and there is little support for them aside from Jones's own statements—I am not persuaded that Outlaw's state of mind bears a meaningful relationship to the reasons for Jones's termination. Jones was terminated by McGee and Honebrink based on the findings of the OIG investigation, which was itself compiled and reported by Inspector Michael Faiella. While it is undisputed that Outlaw played a role in initiating the OIG investigation and that he answered questions that the OIG asked of him, there is no evidence that Outlaw was involved with, consulted on, or even informed about the findings of the investigation into Jones or about disciplinary measures under consideration. Much to the contrary, immediately prior to issuing the Notice of Charges/Reasons for Imminent Discharge, McGee told Outlaw that he did not even possess the OIG report.

[1] In arguing that she has established a prima facie case on her Title VII discrimination claim, Jones's response does not differentiate between her initial suspension, her subsequent suspension without pay, and her ultimate termination.

Meanwhile, McGee and Honebrink did not rely on information produced by Outlaw in deciding to terminate Jones, as Jones's email, computer, and building access records independently showed that she had been absent on days for which she had been paid. Simply put, Outlaw had no discernable involvement in the decision to terminate Jones. Accordingly, even if Jones were to successfully show that Outlaw harbored bias against her, the record does not support a showing that any such bias caused her termination.

I am also not persuaded by Jones's contention that meaningful inferences may be drawn from comparing how SEPTA disciplined Jones and how SEPTA disciplined Outlaw and Solecki in relation to Solecki's underreporting of vacation time to compensate for unpaid overtime work. Jones is correct that a Title VII plaintiff may establish an inference of gender discrimination on the basis that male employees received more favorable treatment. However, she may only do so when she is "similarly situated in all relevant respects" to the male employees to which she seeks to compare herself. *Oliver*, 921 F. Supp. 2d at 447. Such a showing requires that the male employees "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Opsatnik v. Norfolk S. Corp.*, 335 Fed. Appx. 220, 223 (3d Cir. 2009). Plainly, there are substantial, meaningful differences between the conduct SEPTA found concerning Solecki and Outlaw—which implicated neither forgery nor larceny—and the conduct SEPTA found about Jones, namely that she transposed her supervisor's signature onto false time reports to be paid for days she did not work. *See id.*

In short, Jones's initial suspension is not actionable, and she points to nothing that raises an inference of discrimination about her termination. No reasonable jury could find to the

contrary.[2] Accordingly, Jones has failed to make a prima facie case of gender discrimination, *see Sarullo*, 352 F.3d at 797-98, and SEPTA is entitled to summary judgment on Jones's Title VII discrimination claim insofar as it relates to her suspension and/or termination. *Lauren W. ex rel. Jean W.*, 480 at 266.

**b. Hostile Work Environment**

Jones's Title VII discrimination claim is next founded on her contention that sexual harassment by Outlaw subjected her to a hostile work environment. To this effect, "Title VII prohibits sexual harassment that is sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). To prevail on a hostile work environment claim, Jones must show: (1) intentional discrimination because of her sex; (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected her, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of respondeat superior liability. *See id.*

Assuming arguendo that Jones could satisfy the other elements of a hostile work environment claim,[3] the defendants contend there is no respondeat superior liability because SEPTA behaved reasonably and Jones unreasonably with respect to the alleged harassment. In general, "an employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). However, in the companion cases of *Burlington Indus., Inc. v. Ellerth* and *Faragher v. City of Boca Raton*, the

[2] As there is no evidence raising even an inference of discrimination about her termination, there also no basis on which a reasonable jury could find that SEPTA's explanation for Jones's termination is pretext for discrimination.

[3] Whether a reasonable jury could find that the alleged acts of Outlaw constituted "severe or pervasive" discrimination is a question I need not answer.

Supreme Court established that "a defending employer may raise an affirmative defense to liability or damage . . . [if] the supervisor's harassment [does not] culminate[] in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Ellerth*, 524 U.S. at 765; *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). "Th[is] defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id*. *See also Cardenas v. Massey*, 269 F.3d 251, 266 (3d Cir. 2001) ("The [*Faragher-Ellerth* affirmative] defense depends on the reasonableness of both the employer's and the plaintiff's preventative and remedial measures."). According to the defendants, *Faragher-Ellerth* entitles SEPTA to summary judgment on Jones's Title VII claim based on hostile work environment.

**i. Availability of *Faragher-Ellerth***

According to Jones, the *Faragher-Ellerth* affirmative defense is not available to SEPTA because Outlaw's harassment culminated in her suspension and/or her termination, and each was a tangible employment action within the meaning of *Faragher-Ellerth*.

The Supreme Court explained in *Ellerth* that "a tangible employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id*. at 760-61. So defined, "a tangible employment action" is necessarily an adverse employment action. *See Cardenas v. Massey*, 269 F.3d 251, 266 (3d Cir. 2001) ("*Ellerth* enunciated an affirmative defense limiting [automatic employer] liability when the plaintiff has not suffered a tangible *adverse* employment action.") (emphasis added); *Durham Life Ins. Co. v.*

*Evans*, 166 F.3d 139, 152 (3d Cir. 1999) (same). As discussed above, Jones's initial suspension with pay was not an adverse employment action for purposes of Title VII. *See Killen*, 2007 WL 2684541; *Joseph*, 465 F.3d at 91. So too, then, it was not a tangible employment action for purposes of *Faragher-Ellerth*. *See Cardenas*, 269 F.3d at 266. Consequently, it would not matter if a jury were to find that Outlaw subjected Jones to a chain of harassment in which suspending Jones was a final harassing act. Because Jones's initial suspension was not a tangible employment action, it cannot bar SEPTA from invoking *Faragher-Ellerth*. *See Ellerth*, 524 U.S. at 765.

Under *Faragher-Ellerth*, Jones's termination was plainly a tangible employment action. *Id*. at 760-61. However, to prevent a defendant from raising *Faragher-Ellerth*, "[a] plaintiff need show that the tangible employment action was related to the alleged unlawful harassment or retaliation." *Cacciola v. Work N Gear*, __ F. Supp. 2d __, 2014 WL 2217810 (E.D. Pa. May 29, 2014). *See also Seybert v. Int'l Grp., Inc.*, 2009 WL 1971439 (E.D. Pa. July 6, 2009) ("The most reasoned and supported view appears to be that a plaintiff must show that the tangible employment action was related to, or caused by, the alleged unlawful harassment or retaliation before a court may foreclose an employer from asserting the *Faragher-Ellerth* defense.") (citing decisions of the Second, Fourth, Seventh, Ninth, and Eleventh Circuits). As discussed above, the decision to terminate Jones was made by McGee and Honebrink based on the OIG investigation report, which itself relied on information independent from what was produced by Outlaw. Jones's termination is thus distinct from any pattern of harassment by Outlaw, such that "it is clear that [Jones] was not terminated because of [Outlaw's] harassment." *Cacciola*, __ F. Supp. 2d at __, 2014 WL 2217810. Because the termination was not related to the alleged unlawful

harassment, Jones's termination cannot bar SEPTA from raising the *Faragher-Ellerth* affirmative defense, either. *See id.*

Jones has failed to put forth any evidence from which a reasonable jury could find that any pattern of harassment by Outlaw culminated in a tangible employment action. Accordingly, the defendants may raise the *Faragher-Ellerth* affirmative defense. *See Ellerth*, 524 U.S. at 765.

**ii. Affirmative Defense**

According to Jones, SEPTA cannot show that it acted reasonably under the first prong of *Faragher-Ellerth* because of alleged deficiencies in SEPTA's remedial response to Jones's EEO complaint. To defeat the first prong of *Faragher-Ellerth* at summary judgment on the basis of an inadequate remedial response, a plaintiff must "show that there is evidence from which a reasonable jury could conclude that [the defendant] did not 'exercise reasonable care to prevent and correct promptly any sexually harassing behavior.'" *Newsome v. Admin. Office of the Courts of the State of New Jersey*, 51 Fed. Appx. 76, 80 (3d Cir. 2002) (quoting *Ellerth*, 524 U.S. at 765). To this effect, the Third Circuit has held that "a remedial action is adequate if it is reasonably calculated to prevent further harassment." *Knabe v. Boury Corp.*, 114 F.3d 407, 415 (3d Cir. 1997). *See also Ellerth*, 524 U.S. at 806 ("[Title VII]'s primary objective, like that of any statute meant to influence primary conduct, is not to provide redress but to avoid harm."). An employer need not discipline the alleged harasser to meet this standard. *Knabe*, 114 F.3d at 414.

According to the defendants, SEPTA's response was adequate because, after Jones notified the EEO Office of her allegations against Outlaw:[4] (1) Ms. Lorraine McKenzie from the EEO Office investigated Jones's complaint by way of interviewing Jones, Outlaw, and Victoria

[4] This occurred for the first time on the day after Jones was suspended with pay.

Trotman, a colleague of Jones who averred that Outlaw had made unwelcome comments regarding her attire and breast feeding; (2) McKenzie and McGee developed a plan of action to deal with Jones's complaints; (3) McKenzie and McGee required Outlaw to attend a counseling session that included anti-harassment training and instruction on SEPTA's policies regarding sexual harassment and proper workplace behavior; and (4) McGee gave Outlaw a poor review on the leadership portion of his FY2013 performance evaluation, noting that his leadership "need[ed] improvement" and mentioning an "isolated though non-trivial" lapse in judgment, which referred to Outlaw asking Jones to step on his back. The defendants further contend that SEPTA has taken reasonable care through its policies to prevent and/or ameliorate harassment, stating that "SEPTA's Internal Discrimination Complaint Procedure provides a formal process for bringing allegedly discriminatory behavior or practices to SEPTA's attention so that it may implement corrective measures." They note that, "pursuant to that procedure, the EEO Office should be contacted if an employee wishes to file an internal complaint of discrimination," and that Jones "knew since the beginning of her employment with SEPTA in 1988 that the EEO Office was the proper avenue for her to express concerns of behavior in the office or discrimination or harassment or being treated unfairly in the workplace."

Jones does not dispute any of this, nor does she contend that the EEO Office was not independent of Outlaw's supervisory role. By way of response, Jones states only that the discipline of Outlaw was too little and too late in light of Jones's allegations against him. According to Jones, "a jury can certain[ly] conclude that SEPTA's failure to subject Outlaw to significant disciplinary action did not demonstrate a prompt and effective remedial action for Outlaw's outrageous conduct."[5]

[5] Since Jones was suspended the day before she made her complaint to the EEO Office, and subsequently was terminated, she never again worked for Outlaw.

In light of the undisputed evidence that SEPTA had pre-existing procedures in place to prevent and remedy sexual harassment; that its EEO Office conducted a full investigation of Jones's allegations upon learning of them; and that upon completing its investigation the EEO Office required Outlaw to undertake sexual harassment training and demerited him on his evaluation, I find that a jury could not reasonably conclude that SEPTA did not pursue remedial measures with sufficient diligence to avoid further harassment. SEPTA's remedial action was, as a matter of law, reasonably calculated to prevent further harassment, and the defendants have established the first element of the *Faragher-Ellerth* affirmative defense. *See Knabe*, 114 F.3d at 415; *Ellerth*, 524 U.S. at 760-61.

The defendants next contend that they have satisfied the second prong of the *Faragher-Ellerth* affirmative defense by showing that "Jones failed to report her complaints of allegedly offensive conduct to the EEO Office over the course of the 10 years that she was supervised by Outlaw, despite acknowledging that the EEO Office was charged with investigating such concerns." Jones does not challenge this, and, indeed, "this failure to avail herself of the defendant's preventive/remedial apparatus [without excuse] fits squarely into the scenario contemplated by the Supreme Court when it established the second prong of the *Faragher/Ellerth* defense." *Werwinski v. Interstate Brands Corp.*, 2010 WL 3566738 (E.D. Pa. Sept. 14, 2010).

In short, the defendants are correct. Because the alleged harassment by Outlaw did not culminate in a tangible employment action against Jones, the defendants are not strictly liable for any hostile work environment at SEPTA, but are instead entitled to raise the *Faragher-Ellerth* affirmative defense. The record establishes beyond any disputed material facts that SEPTA acted reasonably to prevent and remedy any sexual harassment against Jones, and that Jones herself

did not. No reasonable jury could find otherwise. The *Faragher-Ellerth* affirmative defense is thus satisfied, and SEPTA is entitled to summary judgment on Jones's Title VII claim for hostile work environment. *See Ellerth*, 524 U.S. at 765.

**2. Title VII Retaliation Against SEPTA (Count II)**

Count II of Jones's amended complaint brings a Title VII retaliation claim against SEPTA. Title VII's anti-retaliation provision provides that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter[.]" 42 U.S.C. § 2000e-3.

To establish a prima facie case of retaliation under Title VII, a plaintiff must tender evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006). "If the employee establishes this *prima facie* case of retaliation, the familiar *McDonnell Douglas* approach applies in which the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct." *Id.* at 342. "If it does so, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id*. *See also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2534 (2013) ("[A] plaintiff making a retaliation claim under § 2000e–3 must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."). "To survive a motion for summary judgment in the employer's favor, a plaintiff must produce some evidence

from which a jury could reasonably reach these conclusions." *Moore*, 461 F.3d at 342 (3d Cir. 2006).

Jones contends that she has established a prima facie case of retaliation because the record supports finding that: (1) she engaged in protected activity in the form of filing an EEO complaint against Outlaw and privately informing Outlaw that his behavior was unwelcome; (2) her initial suspension and her termination were adverse employment actions; and (3) she was suspended and terminated because of her alleged protected activity. The defendants do not dispute that Jones's EEO complaint against Outlaw or her alleged informal opposition to Outlaw's alleged sexual harassment was Title VII protected activity. They also do not dispute that Jones's termination was an adverse action. They do contend that Jones's initial suspension was not an adverse action, and, as discussed above, I agree that administrative leave with pay pending investigation is not an adverse action for purposes of Title VII. *See Joseph*, 465 F.3d at 91. Accordingly, Jones cannot make a prima facie case of retaliation under Title VII based on her initial suspension by Outlaw. *See Moore*, 461 F.3d at 340-41.

Jones's Title VII retaliation claim thus turns on the cause of her termination. Jones contends that three types of evidence support finding that she was terminated because of her protected activity: (1) her denials that she submitted falsified time reports; (2) alleged evidence that Outlaw, against whom she has alleged a years-long pattern of harassment, was involved in and manipulated the OIG investigation into her time reports; and (3) alleged procedural and substantive defects in the OIG investigation. SEPTA has proffered that Jones was terminated because she was found to have committed theft of time that it valued at $6,874.20, and not for any reason related to her complaint against Outlaw. In order to survive summary judgment, then, Jones must be able to point to evidence that could persuade a jury "both that the employer's

proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *See Moore*, 461 F.3d at 342.

**i. Jones's Denials**

Jones first contends that a jury may find retaliatory termination from her denial that she forged Outlaw's signature or submitted timesheets containing false information.

When the evidence in a case is such that a rational trier of fact could not credit a self-serving denial, a court may decide so as a matter of law. *See Gonzalez v. Secretary of Dept. of Homeland Sec.*, 678 F.3d 254, 264 (3d Cir. 2012) ("The circumstantial evidence offered by the [defendant] undermines and outweighs [the plaintiff's] claim of ignorance, such that this is a case where the court, based on all of the evidence, can say with confidence that a rational trier of fact could not credit the claimant's denial."). In considering Jones's denial, "the issue is . . . whether [her] testimony, when juxtaposed with the other evidence, is sufficient for a rational factfinder to credit her testimony, despite its self-serving nature." *Johnson v. MetLife Bank, N.A.*, 883 F. Supp. 2d 542, 549 (E.D. Pa. 2009).

It is undisputed that Jones was paid based on her time reports, and that Jones's time reports were generated from timesheets that Jones submitted to Greene that bore Outlaw's signature. It is further undisputed that those time reports resulted in Jones being paid for numerous days on which Outlaw's personal records show that Jones did not work, and on which SEPTA's IT records show that she did not send emails, log into her computer, or use her building access card. Meanwhile, a forensic analyst concluded—and it is visually apparent—that at least 27 of Jones's timesheets bore duplicative signatures of Outlaw, and Greene testified that she typically received Jones's timesheets in electronic form only. This is the evidence that was the basis of McGee and Honebrink's findings that there was cause to terminate Jones.

In response to this circumstantial evidence of fraud, Jones offers only her own statements, and paltry ones at that. In her deposition she testified that she "denied falsifying any documents," and she accused Outlaw of "trumping up outrageous charges and bogus accusations" against her. And later, in a sworn declaration executed days before responding to the instant motion, she added that she "never falsified [her] weekly time sheets" and that "[she] never duplicated Outlaw's signature . . . [or] signed Outlaw's signature on any document." Beyond these blanket denials, Jones does not offer anything tending to rebut the defendants' redundant showings that she was absent on numerous days for which she was paid. She does not assert that she in fact worked on any of the days SEPTA contends she was absent,[6] let alone offer evidence that would tend to show she worked on any particular days. Neither does she offer anything to undermine the electronic corroboration of Outlaw's records of her absences. Although Jones criticizes the OIG's analysis of the IT records on the basis that the OIG allegedly did not examine whether she used her access card, computer, or email on days that she did work, the IT records produced in discovery indeed show that Jones regularly used her access card, computer, and email on workdays that are not contested.

In light of Jones's email, computer, and building access records showing that she did not work on numerous days for which she was paid; the forensic analysis showing that 27 of Jones's timesheets bore duplicative signatures of Outlaw's; Greene's statement that Jones typically submitted her timesheets in electronic form only; and Jones's unwillingness or inability to provide any account of when she worked and when she was absent; Jones's bare denials that she did not submit timesheets with false information are not sufficient to be credited by a rational

---

[6] In her declaration, Jones references the alleged absences using the hypothetical language of "if in fact those were true absences," and states that "I never kept records of my absences, Outlaw did."

factfinder. *See Gonzalez*, 678 F.3d at 264; *Johnson*, 883 F. Supp. 2d at 549. Accordingly, they do not raise an inference that she was terminated because of Title VII protected activity.[7]

### ii. Cat's Paw Liability

Jones next contends that, under the "cat's paw" principles described by the U.S. Supreme Court in *Staub v. Proctor Hosp.*, 131 S. Ct. 1186 (2011),[8] she can prove retaliatory termination by showing that Outlaw, motivated by a desire to retaliate against her, was involved in and manipulated the investigation into her time reports.

Cat's paw liability addresses "the circumstances under which an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision." *See id*. In *Staub*, the Supreme Court established that an employer is liable under the Uniformed Services Employment and Reemployment Rights Act ("USERRA") "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action." *Id*. at 1194 (emphasis in original).[9] Regarding proximate causation and independent factfinding subsequent to a supervisor's biased allegation, the Supreme Court stated the following:

---

[7] In any event, "the employment discrimination laws involved here permit an employer to take an adverse employment action for a reason that is not 'true' in the sense that it is not objectively correct." *Watson v. Se. Pennsylvania Transp. Auth*., 207 F.3d 207, 222 (3d Cir. 2000). *See also id.* ("[I]f an employer sincerely believes that an employee has stolen company funds and discharges the employee for this reason, the employer should not be held liable under [Title VII] just because it turns out that the employee did not steal the funds.").

[8] The Supreme Court explained in *Staub* that "the term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Posner in 1990." *See Staub*, 131 S. Ct. at 1190 n.1.

[9] USERRA provides in relevant part that "A person who is a member of . . . or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, . . . or obligation." 38 U.S.C. § 4311(a). It elaborates further that "An employer shall be considered to have engaged in actions prohibited . . . under subsection (a), if the person's membership . . . is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership." § 4311(c).

> "[I]f the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action (by the terms of USERRA it is the employer's burden to establish that), then the employer will not be liable. But the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified."

*Id.* at 1193.

The Third Circuit has found that *Staub*'s standards for cat's paw liability apply to Title VII retaliation claims. *See McKenna v. City of Philadelphia*, 649 F.3d 171, 180 (3d Cir. 2011) (assessing jury instruction on Title VII retaliation according to *Staub* standard for cat's paw liability). This includes *Staub*'s requirement that, for an employer to be liable on a cat's paw theory, acts of the biased supervisor must be a proximate cause of an adverse action. *See id.* (upholding the instruction because it "incorporated the concept of proximate cause"). *See also Nassar*, 133 S. Ct. at 2535 (holding that Title VII retaliation claim requires showing that the employer "would not have taken the adverse employment action but for a design to retaliate").

The only evidence tying Outlaw to the OIG investigation is the undisputed evidence showing that Outlaw raised the initial allegations of timesheet fraud and provided the OIG with his records of Jones's absences, and that he subsequently answered questions that the OIG asked of him. Assuming arguendo that a jury could conclude that Outlaw took these actions intending to retaliate against Jones by causing her termination—and there is little on the record to support such an inference[10]—*Staub* still requires Jones to show that Outlaw's acts proximately caused her termination. *See Staub* 131 S. Ct. at 1194. This she cannot do, as McGee and Honebrink decided to terminate Jones based on an investigation independent from Outlaw that relied on the handwriting expert's forensic analysis and the IT-generated email, computer, and building access

[10] The only evidence probative of Outlaw having a retaliatory motive when he suspended Jones is Jones's uncorroborated allegation that, one week previously, Jones told Outlaw to not call her his work-wife. Jones's attorney did not ask Outlaw about this alleged conversation at his deposition.

records that corroborated Outlaw's records of Jones's absences. By the plain terms of *Staub*, "the employer's investigation result[ed] in an adverse action for reasons unrelated to the supervisor's original biased action," *see id.* at 1193, and Outlaw's supposed animus is inapposite. There is no evidence from which a reasonable jury could find otherwise.

**iii. The OIG Investigation**

Finally, Jones contends that she can establish retaliatory termination based on a constellation of alleged defects in the OIG investigation that, according to Jones, are probative of bad faith on the part of SEPTA's decisionmakers. None of these allegations raises a genuine issue of fact that SEPTA's investigation and/or decision to terminate Jones was characterized by bad faith and/or bias.

First, Jones alleges that she was not given advance notice that an OIG representative would be present at her meeting with the EEO in which she filed her complaint against Outlaw. Even if it is true that Jones was surprised, Jones does not allege that this prejudiced her ability to mount a defense to the allegations that she falsified her time reports, nor do I see how it would have. Unanticipated questioning by an investigator does not, without more, raise an inference of a bad faith investigation.

Second, Jones contends that SEPTA did not provide her with the opportunity to review the original copies of the purportedly falsified timesheets. SEPTA has maintained throughout this litigation that it does not possess Jones's original timesheets because Jones rarely, if ever, submitted them to Greene in the first place. Notwithstanding that Jones contends she submitted her original timesheets to Greene via inter-office mail, no inferences about SEPTA's good faith may be drawn from its failure to produce documents that it says it does not possess.

Third, Jones complains that SEPTA did not investigate whether she submitted forms correcting errors that she made on her submitted timesheets. These forms are known to the parties as adjustment forms. To this effect, Jones states that it was her general practice to file an adjustment form whenever Outlaw alerted her that she had made an error in her time reports. She does not, however, aver that she filed adjustment forms for any of the days in question. Meanwhile, there is no evidence in the record that Jones asked SEPTA to look into her adjustment forms during its investigation. In any event, the defendants have filed an affidavit from Greene in which she states that, between November 2008 and November 2010, Jones filed a single adjustment form that pertained to her hours-worked for one week in November 2009. Nothing about SEPTA's handling of Jones's adjustment forms raises an inference of a biased investigation.

Fourth, Jones notes that McGee was the SEPTA official responsible for overseeing both the OIG investigation into Jones and the EEO Office's investigation into Outlaw. Jones does not explain why this should raise an inference of bad faith in the OIG investigation and/or McGee and Honebrink's decision to terminate her. As McGee was directly superior to both Outlaw and Jones in the SEPTA hierarchy, and he is not alleged to have previously demonstrated any bias in favor or against either Jones or Outlaw, there are no inferences to be drawn from his oversight of both investigations.

Fifth, Jones alleges that McGee "was in constant communication with Outlaw about the investigations," but she does not provide evidence to support this allegation. There is evidence of only one communication between McGee and Outlaw in the period between Jones's suspension and her termination, and that occurred on the day that McGee issued the Notice of Charges/Reasons for Imminent Discharge. According to Outlaw's records and McGee's

deposition testimony, McGee initiated that conversation to ask Outlaw more questions about his initial review of Jones's timesheets. Furthermore, McGee testified and Outlaw contemporaneously reported that McGee told Outlaw in that conversation that he did not even have access to the OIG report into Jones's timesheets. According to McGee, he "had no intent of giving [Outlaw] a copy" of that report, and he "would not reveal to him what was going to occur or what might occur with Ms. Jones." Contrary to Jones's allegation about constant communication between Outlaw and McGee, the available evidence shows that McGee made an effort to keep Outlaw at arms-length from the OIG investigation and his subsequent disciplinary decision.

Sixth, Jones alleges that the handwriting analyst hired by SEPTA was unable to form a reliable opinion about Jones's timesheets. This criticism of what can be gleaned from the timesheet analysis misses the mark, but, regardless, the OIG investigation relied on separate information for its conclusion that Jones did not work on numerous days for which she accepted payment, namely the building access, computer log-in, and email records demonstrating her attendances and absences. Nothing about the forensic report raises an inference that Jones was terminated for an impermissible purpose.

A reasonable jury could not find that any of the evidence offered by Jones raises an inference that she was terminated because she opposed Outlaw's alleged sexual harassment, let alone that SEPTA's explanation of Jones's termination is pretextual. Accordingly, Jones cannot "show[] both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *See Moore*, 461 F.3d at 342. SEPTA is entitled to summary judgment on Jones's Title VII retaliation claim accordingly.

**3. Equal Protection Violation Against SEPTA and Outlaw (Count V)**

Count V of Jones's amended complaint brings § 1983 claims against SEPTA and Outlaw for violating the Equal Protection Clause of the 14th Amendment. According to Jones's amended complaint, SEPTA and Outlaw violated the Equal Protection Clause by way of the same allegations that underlie her Title VII claims: gender discrimination including sexual harassment, and retaliation for opposing gender discrimination.[11]

The defendants contend that SEPTA is entitled to summary judgment on Jones's Equal Protection claim because Jones cannot establish that any of SEPTA's actions at issue in this lawsuit were motivated by gender bias, let alone show—as it must—that biased conduct was pursuant to a SEPTA custom, policy, or practice. As to Outlaw, they contend that employment discrimination claims under the Equal Protection Clause are subject to the same framework as Title VII claims, such that, because Jones's other employment discrimination claims fail, her Equal Protection claim against Outlaw must fail too.[12] These contentions meet silence from Jones: her responsive argument does not mention § 1983 or the Equal Protection Clause, let alone directly respond to the defendants' arguments about why the Equal Protection claims must fail.

Jones's failure to respond is fatal to her claims. "It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." *Ray v. Pinnacle Health Hospitals, Inc.*, 416 Fed.

---

[11] "The comprehensive scheme provided in Title VII does not preempt section 1983, and [] discrimination claims may be brought under either statute, or both." *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1079 (3d Cir. 1990).

[12] Although I will grant the motion with respect to the Equal Protection claims on the basis of waiver, I note that it appears that only some Equal Protection employment discrimination claims are subject to the same standards as analogous Title VII claims. *Compare Wood v. Univ. of Pittsburgh*, 395 Fed. Appx. 810, 816 (3d Cir. 2010) ("The showing required to prove a § 1983 gender discrimination claim is identical to that required by Title VII. Wood's failure to make out a case of Title VII gender discrimination is thus fatal to her action arising under the Equal Protection Clause.") *with* Third Circuit Model Civil Jury Instruction 7.3, Comment ("*Andrews* [*v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990)] made clear that the elements of hostile environment claims under Title VII and under the Equal Protection Clause are not identical. But *Andrews* did not specify the elements of the latter type of claim.").

Appx. 157, 162 (3d Cir. 2010) (quoting *Liberies v. County of Cook*, 709 F.2d 1122, 1126 (7th Cir. 1983)). *See, e.g., Kamco Indus. Sales, Inc. v. Lovejoy, Inc.*, 779 F. Supp. 2d 416, 430 (E.D. Pa. 2011) ("[The defendant's] opposition brief does not respond to this argument, or make any attempt to defend [the plaintiff's] constructive termination theory. . . . This court therefore finds that [the plaintiff] has waived its constructive termination claim."). Consequently, "[i]f a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived[.]" *Brown v. Johnson*, 116 Fed. Appx. 342, 345 (3d Cir. 2004) (quoting *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995)). Because Jones has not "assert[ed] any legal reason why summary judgment should not be granted" on its Equal Protection claims, I find that Jones has waived those claims, and I will grant summary judgment to the defendants accordingly. *See id.*

**4. FMLA Retaliation Against SEPTA (Count VII)**

Count VII of Jones's amended complaint brings a claim under the FMLA, 29 U.S.C. § 2615. Specifically, Jones alleges that she "was subjected to retaliatory discharge by SEPTA after exercising her rights under the FMLA and taken FMLA leave." To succeed on an FMLA claim based on a theory of post-leave retaliatory discharge, an employee must show she (1) took an FMLA leave, (2) suffered an adverse employment decision, and (3) the adverse decision was causally related to her leave. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 146 (3d Cir. 2004) (citing 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave.")). As in the Title VII context, FMLA retaliation claims based on circumstantial evidence are subject to the *McDonnell-Douglas* burden shifting framework. *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012).

In their motion, the defendants contend that Jones's termination bore no relationship to the FMLA leave that she took—and which SEPTA approved—between August 16, 2010 and November 5, 2010. Rather, as they do in relation to Jones's other claims related to her termination, the defendants maintain that Jones was terminated because SEPTA concluded that she submitted false time reports in order to be paid for time she did not work. In response, Jones points to a series of allegations regarding Outlaw's response to her taking FMLA leave. According to Jones, Outlaw "consistently took retaliatory actions against [her] for taking sick time and medical leave of absence," that he "went to the extent of giving [her] negative rating for attendance simply because [she] asserted her rights to take medical leave of absence and sick time that she is entitled to," and that "within a week of [her] returning to work after taking an authorized FMLA leave, Outlaw drummed up false allegations against [her] that she had falsified her time sheets and had received payment for days she had taken as sick time or medical leave."

As discussed above, there is no evidence that Outlaw was meaningfully involved in the investigation into Jones's timesheets or the decision to terminate her, and the decision to terminate Jones ultimately relied on information independent of what was provided by Outlaw, namely the building access, computer log-in, and email records generated by SEPTA's IT Department. Accordingly, Outlaw's attitudes about Jones's FMLA leave are irrelevant. Jones points to nothing from which a reasonable factfinder could infer a causal connection between her FMLA leave and her termination, much less that SEPTA's explanation for her termination is pretextual. Her FMLA claim against SEPTA fails accordingly. *See Conoshenti*, 364 F.3d at 146.

## B. State Law Claims

### 1. PHRA Gender Discrimination Against SEPTA and Outlaw (Count III)

Jones's amended complaint brings PHRA gender discrimination claims against SEPTA and Outlaw. The basis of these claims is that she "was subjected to sexual harassment because of her gender and hostile work environment and disparate treatment with regards to employment opportunities," and that "Outlaw aided and abetted the sexual harassment of Plaintiff and the gender discrimination of the Plaintiff." Jones's PHRA gender discrimination claims are therefore based on the same allegations as her Title VII gender discrimination claim against SEPTA.

As to SEPTA, it is well-established that analogous Title VII and PHRA claims are interpreted coextensively. *Burton v. Teleflex Inc.*, 707 F.3d 417, 432 (3d Cir. 2013). Accordingly, Jones's PHRA discrimination claim against SEPTA is subject to the same standards as her Title VII discrimination claim. *See id.* As discussed above, Jones's Title VII discrimination claim fails. Consequently, her PHRA discrimination claim against SEPTA fails as well. *See id.*

As to Outlaw, "individual defendants cannot violate [the PHRA's aiding and abetting provision] when there is no corresponding [PHRA] violation by an employer to aid and abet." *Kaniuka v. Good Shepherd Home*, 2006 WL 2380387 (E.D. Pa. Aug. 15, 2006). *See Failla v. City of Passaic*, 146 F.3d 149, 159 (3d Cir. 1998) ("It is fundamental to aiding and abetting liability that the aider and abettor acted in relation to a principal, here, the employer, the city. Once the city has been found liable, the issue becomes whether . . . any employee is liable for aiding and abetting."); *Burgess-Walls v. Brown*, 2011 WL 3702458 (E.D. Pa. Aug. 22, 2011) ("[B]ecause the plaintiff has not plausibly stated a PHRA claim of discrimination against the [defendant employer], her claim against [the individual defendant] as an aider or abettor of discrimination necessarily fails as well."). Because there is no PHRA violation by SEPTA for Jones to aid and abet, Outlaw cannot be liable under the PHRA's aiding and abetting provision. *See id*.

### 2. PHRA Retaliation Against SEPTA and Outlaw (Count IV)

Jones brings PHRA retaliation claims against SEPTA and Outlaw on the basis that she "was subjected to adverse actions by Defendants after complaining and or opposing sexual harassment and gender discrimination by Defendants." She further contends that "Outlaw aided and abetted the retaliations taken against Plaintiff because she opposed the sexual harassment of Plaintiff." Jones's PHRA retaliation claims are therefore based on the same allegations as her Title VII retaliation claim against SEPTA.

As to SEPTA, Jones's PHRA retaliation claim is subject to the same standards as her Title VII retaliation claim. *See Burton*, 707 F.3d at 432. Because Jones's Title VII retaliation claim fails, her PHRA retaliation claim against SEPTA fails as well. *See id.*

Regarding Outlaw, Jones has not established that Outlaw took any adverse employment action against Jones. *See Joseph*, 465 F.3d at 91; *Burton*, 707 F.3d at 432. To the extent that Jones's retaliation claim against Outlaw is based on his own direct acts, then, the claim fails for want of an adverse action. *See Burton*, 707 F.3d at 432. Meanwhile, there can be no aider-abettor liability for Outlaw without a predicate PHRA violation by SEPTA. *Failla*, 146 F.3d at 159. Because SEPTA has not retaliated against Jones in violation of the PHRA, there is no aider-abettor liability for Outlaw under the PHRA on the basis of alleged retaliations by SEPTA. *See Failla*, 146 F.3d at 159.

I will grant the motion for summary judgment as to Jones's PHRA claims. *See Lauren W. ex rel. Jean W.*, 480 at 266.

## IV. Conclusion

For the reasons discussed above, the defendants have shown that they are entitled to summary judgment on all counts and claims asserted by Jones. An appropriate order follows.